1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

7

BERTON G. TOAVS,                    )          3:12-cv-00449-MMD (WGC)
                                    )
8            Plaintiff,             )          **REPORT AND RECOMMENDATION**
                                    )          **OF U.S. MAGISTRATE JUDGE**
9       vs.                         )
                                    )
10   ROBERT BANNISTER, et. al.      )
                                    )
11           Defendants.            )
                                    )
12   _____)

13          This Report and Recommendation is made to the Honorable Miranda M. Du, United

14   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant

15   to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is

16   Plaintiff's Application for Preliminary Injunction Pursuant to FRCP 65(a). (Doc. # 3.)[1]

17   Defendants opposed (Doc. # 12) and Plaintiff replied (Doc. # 15). After a thorough review, the

18   court recommends that Plaintiff's application be denied.

19                              **I. BACKGROUND**

20          At all relevant times, Plaintiff Berton G. Toavs was an inmate in custody of the Nevada

21   Department of Corrections (NDOC). (Pl.'s Compl. (Doc. # 5) at 1.) The allegations giving rise

22   to this action took place while Plaintiff was housed at Northern Nevada Correctional Center

23   (NNCC). (*Id*.) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id*.)

24   Defendants are Dr. Robert Bannister, Dr. David Mar, Dr. Marsha Johns, and John Peery. (*Id*.

25   at 2-3.)

26   ///

27

28          [1] Refers to the court's docket number. Unless otherwise noted, all page number references are to the page numbers in the docketed version, and not the filing party's original page number designations.

**A. Summary of Complaint**

On screening the court determined that Plaintiff states a colorable Eighth Amendment claim for deliberate indifference to a serious medical need. (*See* Screening Order, Doc. # 4.)

Plaintiff alleges that he was originally incarcerated in 2001, and came to NDOC in need of back and neck surgery, which he did not receive for five years, despite his requests. (*Id*. at 4.) He claims that in 2006, Defendants performed an unnecessary carpal tunnel surgery on his left arm and hand. (*Id*.) In 2007, Plaintiff once again requested neck surgery for spinal decompression and calcium buildup in his neck. (*Id*.) This request was denied until 2007, and Plaintiff asserts that the surgery was "too little too late" and that they only allowed half of the necessary surgery, and left him permanently disfigured and partially crippled in his left hand and arm. (*Id*.)

In November of 2010, Plaintiff claims that he began to experience severe pain and a lack of mobility in his hands and arms, in addition to numbness. (*Id*.) He alleges that Defendants ignored his requests for care until Plaintiff filed a complaint in state court, which he concedes was dismissed for failure to exhaust his administrative remedies. (*Id*. at 4-5.)

Plaintiff contends that Defendants gave him the surgery he requested before he could "re-exhaust" his administrative remedies, but five days after the surgery, Defendants knowingly deprived him of pain medication in an effort to cause him harm. (*Id*. at 5.) He further asserts that he was denied requests for physical therapy, depriving him of the chance to maximize his recovery. (*Id*.)

Plaintiff alleges that a year after the surgery he suffers from extreme pain and lack of mobility and numbness in his hands and arms. (*Id*.) He avers that his requests for medical care have been ignored. (*Id*.) He further claims that after the last surgery, the surgeon told him he would need at least one more procedure, but Defendants have not let it happen. (*Id*. at 7, 8.)

Plaintiff claims that Dr. Bannister, as NDOC's medical director, has a policy of encouraging medical staff to deprive inmates of care because of the cost. (*Id*. at 6.) He further alleges that Dr. Bannister failed to adequately train and properly supervise his employees. (*Id*.)

He goes on to allege that Dr. Bannister, Dr. Mar, and Dr. Johns, as members of the Utilization Review Panel (URP), have purposefully deprived Plaintiff of neck and back surgeries for years because of the cost, resulting in further injury to Plaintiff. (*Id.*)

Plaintiff contends that defendant Peery, as NNCC's nursing director, directs his staff to respond to all requests for medical care by telling them to come to sick call for an appointment. (*Id.* at 7.) Plaintiff contends that in reality, appointments rarely are set and sick call only occurs once or twice a week. (*Id.*) When appointments do get set, Plaintiff alleges that they are set forty-five to ninety days out. (*Id.*) Finally, he claims that defendant Peery has stopped him from seeing the eye-doctor, ignoring his requests in contravention of orders after his surgery. (*Id.* at 8.)

**B. Requested Relief**

Plaintiff now moves for a preliminary injunction, requesting an appointment with a neurologist, and that defendants follow any treatment suggested by the neurologist, including allowing recommended surgical procedures, and prescribing pain medication. (Doc. # 3 at 1.) Plaintiff argues that he is likely to succeed on the merits and is likely to suffer irreparable injury because: (1) his medical records establish that he had to wait more than four years to have a surgery performed which left him with fifty percent of the use of his left hand; (2) he only received the second surgery after he attempted to sue; and (3) Plaintiff has been unable to secure non-narcotic pain medication for over six months and has been unable to see a physician to assess his current symptoms. (*Id.* at 2.) Plaintiff fears that if the court does not intervene, he will lose use of his left hand altogether. (*Id.*)

Next, Plaintiff asserts that there is no legitimate medical or penological reason for denying his requests for treatment. (*Id.* at 2-3.) Finally, he argues that it is in the public interest for Defendants to act according to the Constitution and other laws. (*Id.* at 3.) Plaintiff has provided a declaration in support of his position. (Doc. # 3 at 5-9.)

**C. Defendants' Opposition**

Defendants oppose Plaintiff's request for a preliminary injunction, arguing: (1) Plaintiff

cannot demonstrate a likelihood of success on the merits because his claims that his medical needs have been ignored are belied by the records, and his difference in opinion with respect to the care he is receiving does not amount to deliberate indifference; (2) he cannot establish a real or immediate threat of irreparable injury; (3) the balance of hardships tips in favor of Defendants because issuance of an injunction would require significant and unjustified interference into the internal workings of the prison system; and (4) an injunction is not in the public interest when Plaintiff's request is based only on his own unsupported statements and resolution of the lawsuit may provide him with adequate relief. (Doc. # 12.)

**D. Plaintiff's Reply**

Plaintiff has filed a reply, which in large part reiterates the arguments set forth in his request for injunctive relief. (Doc. # 15.) In addition, he argues that Defendants cannot explain why it took them six years to authorize his first surgery, four years for the second surgery, and eighteen months after the second surgery to deny him further care. (*Id.*) He also claims that Defendants have withheld information regarding Plaintiff's multiple requests since July 2012 to be seen by a doctor for his neck problems, that have gone unaddressed. (*Id.*)

## II. LEGAL STANDARD

The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted). The instant motion requires that the court determine whether Plaintiff has established the following: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of

4

1    preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the

2    public interest. *Id.* at 20 (citations omitted).

3          Before *Winter*, courts in the Ninth Circuit applied an alternative "sliding-scale" test for

4    issuing a preliminary injunction that allowed the movant to offset the weakness of a showing

5    on one factor with the strength of another. *See Alliance for Wild Rockies v. Cottrell*, 632 F.3d

6    1127, 1131 (9th Cir. 2011). In *Winter*, the Supreme Court did not directly address the continued

7    validity of the Ninth Circuit's sliding-scale approach to preliminary injunctions. *See Winter*,

8    555 U.S. at 51 (Ginsburg, J., dissenting: "[C]ourts have evaluated claims for equitable relief on

9    a 'sliding scale,' sometimes awarding relief based on a lower likelihood of harm when the

10   likelihood of success is very high…This Court has never rejected that formulation, and I do not

11   believe it does so today."); *see also Alliance*, 632 F.3d at 1131. Instead, the portion of the

12   sliding-scale test that allowed injunctive relief upon the possibility, as opposed to likelihood,

13   of irreparable injury to the plaintiff, was expressly overruled by *Winter*. *See Stormans, Inc. v.*

14   *Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009). The Ninth Circuit has since found that post-

15   *Winter*, this circuit's sliding-scale approach, or "serious questions" test "survives…when

16   applied as part of the four-element *Winter* test." *Alliance*, 632 F.3d at 1131-32. "In other words,

17   'serious questions going to the merits' and a hardship balance that tips sharply toward the

18   plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter*

19   test are also met." *Id.*

20         An even more stringent standard is applied where mandatory, as opposed to prohibitory

21   preliminary relief is sought. The Ninth Circuit has noted that although the same general

22   principles inform the court's analysis, "[w]here a party seeks mandatory preliminary relief that

23   goes well beyond maintaining the status quo pendente lite, courts should be extremely cautious

24   about issuing a preliminary injunction." *Martin v. International Olympic Committee*, 740

25   F.2d 670, 675 (9th Cir. 1984) (citation omitted). Thus, an award of mandatory preliminary

26   relief is not to be granted unless both the facts and the law clearly favor the moving party and

27   extreme or very serious damage will result. *See Anderson v. United States*, 612 F.2d 1112, 1115

28

1  (9th Cir. 1979) (citations omitted). "[I]n doubtful cases" a mandatory injunction will not issue.

2  *Id.*

3       Finally, the Prison Litigation Reform Act (PLRA) mandates that prisoner litigants must

4  satisfy additional requirements when seeking preliminary injunctive relief against prison

5  officials. The PLRA provides, in relevant part:

6           Preliminary injunctive relief must be narrowly drawn, extend no
            further than necessary to correct the harm the court finds requires
7           preliminary relief, and be the least intrusive means necessary to
            correct that harm. The court shall give substantial weight to any
8           adverse impact on public safety or the operation of a criminal
            justice system caused by the preliminary relief and shall respect the
9           principles of comity set out in paragraph (1)(B) in tailoring any
            preliminary relief.

10  18 U.S.C. § 3626(a)(2). Thus, § 3626(a)(2) limits the court's power to grant preliminary

11  injunctive relief to inmates. *See Gilmore v. People of the State of California*, 220 F.3d 987, 998

12  (9th Cir. 2000). "Section 3626(a)...operates simultaneously to restrict the equity jurisdiction

13  of federal courts and to protect the bargaining power of prison administrators-no longer may

14  courts grant or approve relief that binds prison administrators to do more than the

15  constitutional minimum." *Id.* at 999.

16                              **III. DISCUSSION**

17  **A.  Likelihood of success on the merits**

18       In order to be granted a preliminary injunction, Plaintiff must show he is likely to

19  succeed on the merits of a claim that would entitle him to the equitable remedy he seeks.

20  *Winter*, 555 U.S. at 20.

21       **1. Legal Standard- Eight Amendment Deliberate Indifference to Serious**

22  **Medical Need**

23       A prisoner can establish an Eighth Amendment violation arising from deficient medical

24  care if he can prove that prison officials were deliberately indifferent to a serious medical need.

25  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less

26  stringent in cases involving a prisoner's medical needs than in other cases involving harm to

27  incarcerated individuals because '[t]he State's responsibility to provide inmates with medical

28

                                        6

1   care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*,

2   974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104

3   F.3d. 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an

4   inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors

5   or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

6        A finding of deliberate indifference involves the examination of two elements: "the

7   seriousness of the prisoner's medical need and the nature of the defendant's responses to that

8   need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir.

9   2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need

10  exists if the failure to treat a prisoner's condition could result in further significant injury or

11  the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*,

12  429 U.S. at 104); *Akhtar*, 698 F.3d at 1213 ("First, the plaintiff must show a serious medical

13  need by demonstrating that failure to treat a prisoner's condition could result in further

14  significant injury or the unnecessary and wanton infliction of pain."). Examples of conditions

15  that are "serious" in nature include "an injury that a reasonable doctor or patient would find

16  important and worthy of comment or treatment; the presence of a medical condition that

17  significantly affects an individual's daily activities; or the existence of chronic and substantial

18  pain." *Id*. at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting

19  *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several

20  months demonstrated a serious medical need).

21       If the medical needs are serious, Plaintiff must show that Defendants acted with

22  deliberate indifference to those needs. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213

23  (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v.

24  Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more

25  than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient

26  to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate

27  indifference is only present when a prison official "knows of and disregards an excessive risk

28

to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong...is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511 U.S. at 858). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

In addition, a prison physician is not deliberately indifferent to an inmate's serious medical need when the physician prescribes a different method of treatment than that requested by the inmate. *See McGuckin*, 974 F.2d at 1059 (explaining that negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *see also Snow v. McDaniel*, 681 F.3d 978, 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (difference of opinion between a prisoner-patient and medical staff regarding treatment is not cognizable under § 1983). To establish that a difference of opinion amounted to deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted); *see also Snow*, 681 F.3d at 988 (quoting *Jackson*, 90 F.3d at 332) (finding that "a reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under the circumstances").

**2. Summary of Relevant Medical Evidence**

Defendants have submitted the declaration of Marsha Johns, D.O., a Senior Physician at NDOC and member of the URP. (Doc. # 12 at 14-15, Ex. A ¶¶ 2-3.) As a member of the URP, she makes decisions related to medical care and treatment, including whether an inmate is to be referred to an outside provider or specialist. (*Id.* ¶ 6.) Generally, a Consultation Request/Report form is submitted when such a referral is requested. (*Id.*) The URP then reviews the inmate's medical file and makes a determination. (*Id.*) After reviewing Plaintiff's medical file, Dr. Johns reports that from September 2005 through July 2011, sixteen such forms were submitted on behalf of Plaintiff, and all sixteen were approved by the URP. (*Id.* ¶¶ 7-8.)

Defendants also submitted Plaintiff's medical records from 2010 up to the time the opposition was filed, accompanied by the declaration of Sharon Clinkscales, authenticating the documents. (Doc. # 13, filed under seal.) The records are summarized below.

Plaintiff complained of headaches possibly because of problems with his eyes on March 23, 2010. (Doc. # 13 at 66.) Plaintiff was seen by an outside provider on June 3, 2010, complaining of vision changes since undergoing surgery. He was treated with glasses. (Doc. # 13 at 32-33.)

On January 7, 2011, Plaintiff's chart was reviewed which revealed he had undergone neck surgery for radiculopathy to the right arm. (Doc. # 13 at 25.)

On March 31, 2011, he was seen for complaints of numbness in his thumb, and a burning on his right forearm as well as pain in the back up his neck, going up his head. (Doc. # 13 at 26.) Dr. Gedney expressed concern that Plaintiff was developing an ailment on the right arm similar to that which previously plagued his left arm. (*Id.*) She checked his cervical films and referred him back to a neurosurgeon. (*Id.*, Doc. # 13 at 20, 34.)

An MRI of the neck was ordered on April 18, 2011. (Doc. # 13 at 20, 35.)

Plaintiff was seen by the neurosurgeon, Dr. Vacca, on May 18, 2011. (Doc. # 13 at 36-

38.)Dr. Vacca noted that he performed a surgery on Plaintiff in October 2007. (*Id.*)[2] Dr. Vacca stated that Plaintiff benefitted from the surgery. (*Id.*) It was also noted that he had ulnar nerve surgery, and had some chronic changes in his hand clawing and weakness in the first dorsal interossei. (*Id.*) He had some improvement, but started to have symptoms in his right side, including intermittent tingling and numbness in his first three fingers, and occasionally in the fourth and fifth fingers. (*Id.*) He also complained of chronic numbness in the left hand and recurrent symptoms in the left side. (*Id.*) An MRI showed extensive degenerative changes from C4 down to the upper thoracic spine. (*Id.*) He was noted as having a certain degree of canal stenosis with narrowing where he had not had surgery. (*Id.*) Dr. Vacca's impression was that Plaintiff had severe cervical spondylosis with bilateral radicular symptomatology. (*Id.*) Plaintiff stated that the symptoms are bothersome enough that if surgery could help, he would like to move forward. (*Id.*) Dr. Vacca recommended anterior cervical decompression and fusion, local bone graft and anterior plate. (*Id.*) Plaintiff expressed that he understood the risks, and that there was a ten percent failure rate. (*Id.*) Plaintiff indicated his intention to proceed. (*Id.*)

On May 19, 2011, the surgery with Dr. Vacca was scheduled. (Doc. # 13 at 20, 39.) Preparation for surgery commenced on June 13, 2011. (Doc. # 13 at 20.) An EKG and labs were performed on June 20, 2011. (*Id.* at 27.) Surgery was performed on July 8, 2011. (Doc. 13 at 41-50.)

Plaintiff returned to the clinic after surgery on July 11, 2011, stating that he was okay and did not want to go to the infirmary. (Doc. # 13 at 27.) He was prescribed pain medication and instructed to come to the clinic if he experienced an increase in pain, opening of the wound, or other concerning symptoms. (*Id.*)

Plaintiff was prescribed pain medication on July 11, 2011. (Doc. # 13 at 21.) Cervical spine x-rays were ordered on July 14, 2011, and taken on July 29, 2011. (*Id.*, 61.)

Plaintiff was seen for a follow up to his surgery on August 9, 2011. (Doc. # 13 at 52.)

---

[2]The surgery was described as a left-sided 6-7, 7-1 and T1-T2 laminoforaminotomies for decompression of his left C7-C8 and T1 nerve roots.

10

1   Plaintiff reported improvement. (*Id.*) He was instructed to follow up with Dr. Vacca as needed.
2   (*Id.*) Dr. Vacca reviewed Plaintiff's x-rays on August 15, 2011, and reported that they "look very
3   good." (*Id.* at 53-54.) He was told to have follow-up x-rays taken in three months. (*Id.*)

4       Plaintiff sent a kite on August 9, 2011, stating that he saw Dr. Vacca, and requested to
5   see Dr. Gedney. (Doc. # 13 at 81.)

6       Plaintiff presented to sick call on August 15, 2011. (Doc. # 13 at 27.) It was noted that he
7   was on the schedule for a follow up with his provider on August 25, 2011, and he told sick call
8   that he would wait for his appointment to discuss post-surgical and other medical problems.
9   (*Id.*) Cervical spine x-rays were ordered on August 18, 2011. (*Id.*, Doc. # 13 at 21.)

10      Plaintiff was seen by Dr. Gedney on August 25, 2011, after his second cervical neck
11  surgery, and reported that the surgery helped with the issues with his right arm. (Doc. # 13 at
12  27-28.) He was ordered medication and scheduled to seen an eye doctor. (Doc. # 13 at 21.)

13      On September 23, 2011, Plaintiff sent a kite relating to his medications.(Doc. # 13 at 83.)

14      X-rays of the cervical spine were ordered on October 5, 2011, and taken on November
15  9, 2011. (Doc. # 13 at 22, 62.)

16      Plaintiff reported to sick call on December 23, 2011, complaining of pain and numbness
17  in his hands and arms, as well as pain in the back of his neck. (Doc. # 13 at 28.) He was brought
18  to the Regional Medical Facility on December 25 to December 30, 2012, for evaluation. (*Id.*)
19  He was given medication and  was scheduled for an appointment with a physician on February
20  1, 2012. (*Id.*, Doc. # 13 at 22.) X-rays of the cervical spine were taken on January 18, 2012. (*Id.*
21  at 63.)

22      Dr. Vacca reviewed Plaintiff's x-rays on February 6, 2012, and reported to Dr. Gedney
23  that they "look very good." (Doc. # 13 at 55-56.) He further stated: "At this point in time I do
24  not see a need to repeat any x-rays unless new symptoms were to develop. Should that occur
25  you can contact our office." (*Id.*)

26      On February 9, 2012, Plaintiff complained that he was coughing and felt as though his
27  throat was closing off at times. (Doc. # 13 at 28-29.) Dr. Gedney examined him and stated that

28

1  this could be due to his prior neck surgeries. (*Id.*)

2      Plaintiff presented to sick call on May 25, 2012, with complaints of neck pain, vision

3  problems and burning hands. (Doc. # 13 at 29.) He was scheduled to see a provider on June 27,

4  2012. (*Id.*)

5      On July 10, 2012, Plaintiff sent a kite complaining of pain in his arms, hands, neck and

6  back, and of headaches and vision problems. (Doc. # 97 at 101.)

7      Plaintiff was seen on July 10, 2012, for complaints of pain in his upper extremities. (Doc.

8  # 13 at 29-30.) He was observed as having chronic neuropathy/radiculopathy status post

9  cervical spine surgery, and a cough possibly to scar tissue following surgery. (*Id.*) He was

10  scheduled to be seen by the eye clinic, and soft-tissue x-rays of the neck were ordered. (*Id.*) The

11  x-rays were taken on July 15, 2012. *Id.* at 64.) They revealed a normal soft tissue neck

12  examination, and anterior cervical fusion from C4-C7 with a developing osteophyte superioro

13  to C4, bridging C3.

14      Plaintiff was seen by nursing on July 25, 2012, and his vitals were taken. (Doc. # 13 at

15  30.)

16      Plaintiff sent various kites in 2012 asking for medications to be reordered. (Doc. # 13 at

17  89-101.) The physicians orders for this time frame indicate that various medications were

18  prescribed and/or renewed. (*Id.* at 22-23.)

19      **3. Analysis**

20      A review of the declaration of Dr. Johns and Plaintiff's medical records reveals that

21  Plaintiff has not established a likelihood of success on the merits. Plaintiff has been seen by

22  NDOC's medical staff on numerous occasions between 2010 and 2012. When it was

23  appropriate, he was referred to an outside specialist for a consultation. When the outside

24  consultant recommended surgery, the procedures were approved and undertaken. The

25  evidence before the court does not suggest Plaintiff is likely to succeed on his claim that

26  Defendants have been deliberately indifferent to his serious medical need. Instead, it appears

27  that if Plaintiff feels he needs to see a neurologist, he should utilize NDOC's kite system to

28

12

request an appointment, and if his health care providers there deem it medically appropriate, he will be referred to a specialist. The court need not intervene in this process by issuing an injunction.

While Plaintiff asserts that Defendants have withheld information regarding his requests for treatment since July 2012, he has not provided any documentation himself to support this claim. Nor does he provide the court with any details regarding these requests, *e.g.*, the dates they were made; who they were made to; what, specifically, he was requesting; whether any response was given; and how many requests he has made. At this point, the court has the declaration of Ms. Clinkscales, stating that Defendants have provided the court with true and correct copies of Plaintiff's kites from March 23, 2010 through September 25, 2012. (Doc. # 13 at 3-4 ¶7.) Without any additional detail from Plaintiff the court cannot conclude that Plaintiff is *likely* to succeed on the merits on this basis.

**B. Likelihood of suffering irreparable harm**

Plaintiff must demonstrate that irreparable injury is likely in the absence of an injunction. *Winter*, 555 U.S. at 20. "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Id.* at 22 (citations omitted).

Plaintiff merely states that he fears if the court does not intervene he will lose all use of his left hand, but he does not support his conjecture with any evidence. His mere speculation that he will lose the use of his hand, unsupported by any reference to information in his medical records or by providing specific details regarding the harm he fears he will suffer, is not sufficient to establish he is *likely* to suffer such harm. Plaintiff must demonstrate a *likelihood*, and not just a remote *possibility* of irreparable harm. *See Winter*,555 U.S. at 22 (citation omitted) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

**C. Balance of hardships and Public Interest**

A party seeking injunctive relief "must establish…that the balance of equities tips in his

1    favor." *Winter*, 555 U.S. at 20. In addition, "[i]n exercising their sound discretion, courts of

2    equity should pay particular regard for the public consequences in employing the extraordinary

3    remedy of injunction." *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).

4         Plaintiff cannot establish that the balance of hardships tips in his favor or that an

5    injunction is in the public interest. His medical records evidence that when he has sought

6    medical treatment, including referral to a specialist such as a neurologist, treatment has been

7    provided and referrals have been made. Therefore, the balance of hardships cannot be said to

8    tip in Plaintiff's favor.

9         While it is, broadly speaking, in the public's interest for state officials to follow the law,

10   there is no evidence that Defendants are not doing so at this time. Thus, the court cannot

11   conclude that an injunction is in the public interest.

12   **D. Conclusion**

13        The prerequisites for injunctive relief not having been met, Plaintiff's request for

14   injunctive relief should be denied.

15                    **IV. RECOMMENDATION**

16        **IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **DENYING**

17   Plaintiff's application for injunctive relief (Doc. # 3).

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

The parties should be aware of the following:

1.      That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED:  April 9, 2013

_____
WILLIAM G.  COBB
UNITED STATES MAGISTRATE JUDGE

15