1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

BERTON G. TOAVS,                                    3:12-cv-00449-MMD-WGC

                                    Plaintiff,      **REPORT & RECOMMENDATION OF
                                                    U.S. MAGISTRATE JUDGE**

        v.

ROBERT BANNISTER, et. al.,

                                    Defendants.

        This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Defendants' Motion for Summary Judgment (Doc. # 47)[1] and errata (Doc. # 52).[2] Plaintiff filed a response (Doc. # 59) as well as his own Motion for Summary Judgment (Doc. # 60).[3] Defendants filed a reply in support of their motion (Doc. # 63) and response to Plaintiff's motion (Doc. # 64). Plaintiff filed a reply in support of his motion. (Doc. # 68.) In addition, the court ordered Defendants to file under seal those medical records Plaintiff referenced but did not file along with his briefing, and were not also submitted with Defendants' briefing. (*See* Order at Doc. # 69, sealed submission at Doc. # 71.)

        After a thorough review, the court recommends that Plaintiff's motion be denied, and that Defendants' motion be granted in part and denied in part.

///

_____

        [1] Refers to court's docket number.

        [2] The errata contains defendant John Peery's declaration which was inadvertently omitted from the exhibits to the original filing.

        [3] Docs. # 59 and # 60 are identical but were docketed separately by the Clerk to reflect that Plaintiff both opposed Defendants' motion and seeks summary judgment on his own behalf.

# I. BACKGROUND

At all relevant times, Plaintiff was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl., Doc. # 5 at 1.) The allegations giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). (*Id*.) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id*.) The defendants are Dr. Robert Bannister, Dr. David Mar, Dr. Marsha Johns and John Peery (NNCC's director of nursing). (*Id*. at 2-3.) On screening, the court determined Plaintiff states colorable Eighth Amendment claims for deliberate indifference to his serious medical needs. (Screening Order, Doc. # 4.)

Plaintiff alleges that he was incarcerated in 2001, and came to NDOC in need of back and neck surgery, which he did not receive for five years despite his requests. (Doc. # 5 at 4.) He claims that in 2006, Defendants performed an unnecessary carpal tunnel surgery on his left arm and hand. (*Id*.) In 2007, Plaintiff once again requested neck surgery for spinal decompression and calcium buildup in his neck. (*Id*.) He claims this request was finally granted in October 2007, but it was "too little too late" as they only allowed half of the necessary surgery, and left him permanently disfigured and partially crippled his left hand and arm. (*Id*.)

In November 2010, Plaintiff claims he began to experience severe pain and a lack of mobility in his hands and arms, in addition to numbness. (*Id*.) He contends Defendants ignored his requests for care until he filed a complaint in state court, which he concedes was dismissed for failing to exhaust his administrative remedies. (*Id*. at 4-5.)

Plaintiff asserts Defendants gave him the requested surgery before he could "re-exhaust" his administrative remedies, but five days after the surgery they knowingly deprived him of pain medication in an effort to cause him harm, contrary to the surgeon's orders. (*Id*. at 5.) He further claims his requests for physical therapy were denied, depriving him of the chance to maximize the recovery for his left hand and arm. (*Id*.)

Plaintiff then alleges that more than a year after the surgery he continues to suffer from extreme pain and lack of mobility and numbness in his hands and arms. (*Id*.) He claims his requests for medical care have been ignored. (*Id*.) He also states that after the last surgery, the

1    surgeon told him he would need at least one more procedure, but Defendants would not let it

2    happen. (*Id.* at 7, 8.)

3        Plaintiff avers that Dr. Bannister, NDOC's former medical director, had a policy of

4    encouraging medical staff to deprive inmates of care due to cost or the inmate's conviction or for

5    other reasons the employees chose. (*Id.* at 6.) He further contends Dr. Bannister failed to

6    adequately train and supervise his employees. (*Id.*)

7        Plaintiff asserts that Dr. Bannister, Dr. Mar, and Dr. Johns, as members of the Utilization

8    Review Panel (URP), purposefully deprived him of neck and back surgeries for years because of

9    the cost, resulting in further injury. (*Id.*)

10       With respect to John Peery, Plaintiff contends as NNCC's nursing director, he

11   inappropriately directed staff to respond to requests for medical care by telling inmates to come

12   to sick call for an appointment, when in reality the appointments are rarely set and sick call only

13   occurs once or twice a week. (*Id.*) When appointments are set, he claims they are forty-five to

14   ninety days out. (*Id.*)

15       Finally, he claims that the last surgery changed the pressure on his optic nerve and

16   changed his vision. (*Id.* at 8.) As a result, his prescription for eye glasses is different, but he

17   contends that John Peery stopped him from seeing the eye doctor, ignoring his requests in

18   contravention of orders after his surgery. (*Id.* at 8.)

19       Plaintiff's Complaint acknowledges the allegations beyond the statute of limitations are

20   not actionable, but states that he includes them for background information and to show a pattern

21   of conduct. (*See* Doc. # 5 at 5.)

22       Defendants move for summary judgment, arguing: (1) any claims or damages arising

23   before January 10, 2010 are barred by the statute of limitations; and (2) Defendants were not

24   deliberately indifferent to Plaintiff's serious medical needs because they continuously and

25   effectively provided Plaintiff with needed medical care. (Doc. # 47.)

26       Plaintiff, on the other hand, argues that his medical records establish that Defendants

27   were deliberately indifferent to his serious medical needs. (Docs. # 59/60.)

28   ///

1

## II. LEGAL STANDARD

2      "The purpose of summary judgment is to avoid unnecessary trials when there is no

3  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

4  F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

5  judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

6  525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

7  (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine

8  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

9  Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

10  issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

11  250 (1986).

12      A party asserting that a fact cannot be or is genuinely disputed must support the
        assertion by:

13      (A) citing to particular parts of materials in the record, including depositions,
        documents, electronically stored information, affidavits or declarations,

14      stipulations (including those made for purposes of the motion only), admissions,
        interrogatory answers, or other materials; or

15      (B) showing that the materials cited do not establish the absence or presence of a
        genuine dispute, or that an adverse party cannot produce admissible evidence to

16      support the fact.

17  Fed. R. Civ. P. 56(c)(1)(A), (B).

18      If a party relies on an affidavit or declaration to support or oppose a motion, it "must be

19  made on personal knowledge, set out facts that would be admissible in evidence, and show that

20  the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

21       In evaluating whether or not summary judgment is appropriate, three steps are necessary:

22  (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as

23  to a material fact; and (3) considering the evidence in light of the appropriate standard of proof.

24  *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect

25  the outcome of the suit under the governing law will properly preclude the entry of summary

26  judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

27      In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

28  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

That being said,
[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See*

- 5 -

1   *Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all

2   justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is

3   merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

4   50 (citations omitted).

5   **III. DISCUSSION**

6   **A. Statute of Limitations**

7       Section 1983 does not contain its own statute of limitations; therefore, federal courts

8   borrow the statute of limitations for section 1983 claims applicable to personal injury claims in

9   the forum state. *See Wilson v. Garcia,* 471 U.S. 261, 279-80 (1985); *Pouncil v. Tilton,* 704 F.3d

10  568, 573 (9th Cir. 2012). In Nevada, the statute of limitations for personal injury claims, and

11  therefore § 1983 actions brought here, is two years. Nev. Rev. Stat. § 11.190(4)(e); *see also*

12  *Perez v. Seevers*, 869 F.2d 425, 426 (9th Cir. 1989).

13      "A statute of limitations begins to run on the date on which the plaintiff's claim

14  'accrues.'" *Pouncil,* 704 F.3d at 573 (citation omitted). "Federal law determines when a cause of

15  action for a Section 1983 claim accrues and, hence, when the statute of limitations beings to

16  run." *Id*. (citation omitted). Under federal law, a claim accrues "when the plaintiff knows or has

17  reason to know of the injury that is the basis of the action." *Id.* at 574 (citation omitted).

18      Defendants are correct that Plaintiff's claims are limited by the statute of limitations to

19  the two years prior to the time the Complaint was filed—to October 16, 2010. Plaintiff

20  acknowledges as much in his Complaint. (*See* Doc. # 5 at 5.) In his opposition, and cross-motion,

21  however, he tries to assert that the alleged deliberate indifference was ongoing.

22      Under federal law, Plaintiff's claims accrued when he knew or had reason to know of the

23  injuries that form the bases for the claims. Therefore, he is limited to those events occurring in

24  the two years preceding the filing of the Complaint because he specifically alleges when he knew

25  of the medical conditions and alleged injuries giving rise to his claims.

26      As such, the Complaint is restricted to the following allegations: (1) that in November

27  2010, he began to experience severe pain, numbness and a lack of mobility in his hands and arms

28  and Defendants ignored his requests until he filed a lawsuit in state court; (2) Defendants

eventually approved the necessary surgery, but five days after, they knowingly deprived him of pain medication in contravention of his surgeon's orders, and he was denied requests for physical therapy which would have maximized his recovery; (3) he began to experience extreme pain and lack of mobility a year after this surgery, and his requests for medical care were ignored; (4) his surgeon requested one more surgical procedure, but Defendants would not approve it; (5) (from October 2010 forward) Dr. Bannister had a policy of encouraging staff to deprive inmates of care due to the cost or the inmate's particular conviction, and also failed to train and supervise his employees; (6) Dr. Bannister, Dr. Mar and Dr. Johns, as members of the URP, purposefully deprived him of surgeries (from October 16, 2010 forward) due to the cost; (7) John Peery oversaw the nursing department, and under his direction, sick call appointments rarely were scheduled, and when they did occur, they were set out too far;  and (8) John Peery ignored his requests for a visit with the eye doctor despite doctors' orders which acknowledged a change in his vision following his last surgery.

The court will review and mention facts concerning Plaintiff's medical condition prior to October 16, 2010, for background purposes only.

**B. Eighth Amendment Deliberate Indifference to Serious Medical Needs**

**1. Legal Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

A claim for deliberate indifference involves the examination of two elements: "the

seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted). "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other*

1  *grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. Mar. 6, 2014). Where delay in receiving

2  medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury.

3  *McGuckin*, 974 F.2d at 1060.

4        "A difference of opinion between a physician and the prisoner—or between medical

5  professionals—concerning what medical care is appropriate does not amount to deliberate

6  indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)).

7  Instead, to establish deliberate indifference in the context of a difference of opinion between a

8  physician and the prisoner or between medical providers, the prisoner "'must show that the

9  course of treatment the doctors chose was medically unacceptable under the circumstances' and

10  that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's

11  health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

12        **2. Summary of Evidence**

13        Defendants argue that Plaintiff's medical records establish that Plaintiff received

14  continuous responsive medical care during the relevant time period. Plaintiff, on the other hand,

15  claims that his medical records demonstrate deliberate indifference. The court will now review

16  the pertinent evidence.

17        As background information, a November 14, 2006 memorandum from Dr. Gedney to

18  Dr. Dawson, indicates that Plaintiff underwent surgery related to carpal tunnel by orthopedic

19  surgeon, Dr. Long, in April 2006, but still had weakness in his left arm following the procedure.

20  (Doc. # 71-1 at 14-15.) Dr. Gedney concluded he probably did have radiculopathy at C8, and

21  asked Dr. Dawson to re-evaluate Plaintiff and provide his recommendations. (*Id.*) A progress

22  note from Dr. Dawson in February 2007, referenced atrophy in both hands as well as

23  degenerative cervical and upper thoracic disc disease. (Doc. # 71-1 at 10-13.) Dr. Dawson

24  requested additional studies to determine what to do about surgery, which he thought might

25  involve a multilevel decompression. (*Id.*) At that time, Dr. Dawson indicated that pain

26  medication would be appropriate, but deferred the issue to Dr. Gedney. (*Id.*)

27        Plaintiff underwent neck surgery in 2007 related to the atrophy in his left arm and nerve

28  compression. (*See* Doc. # 48-5 at 2.) In December 2009, he complained of increased pain and

1   discomfort in his neck and right shoulder and arm, and requested a keep-on-person Tylenol pain

2   pack. (Doc. # 48-4 at 2.)  It was noted that he had a history of cervical neck decompression and

3   nerve damage to his upper extremities. (*Id*.) He was given the requested Tylenol pain pack and

4   was advised to follow up with his provider if he had increased pain or no improvement. (*Id*.)

5          On September 26, 2010, Plaintiff sent a request to have his prescriptions refilled, and this

6   was done the following day. (Doc. # 48-2 at 6.) Plaintiff's keep-on-person medications were

7   renewed again on November 16, 2010. (Doc. # 48-1 at 3.) His Flexeril[4] prescription was renewed

8   on January 7, 2011. (Doc. # 48-1 at 3.)

9          On March 23, 2010, Plaintiff sent a kite to Dr. Gedney, stating that he was having

10  worsening headaches, and requested an eye appointment because he did "not do well in sun or

11  dorm lighting without dark lenses," and also mentioned that the lump on the right side of his

12  neck was still bothering him. (Doc. # 48-2 at 2; Doc. # 59-2 at 42.) In response, he was told he

13  would be put on a list to be seen by the eye doctor. (*Id*.) He was told he would not get glasses

14  with a tint, and it was suggested that he check the canteen for sunglasses with respect to his eye

15  problem. (*Id*.)

16         On January 9, 2011, Plaintiff requested a refill of his keep-on-person medications, which

17  was done on January 10, 2011. (Doc. # 48-2 at 9.)

18         On March 30, 2011, Plaintiff submitted a non-specific request for a medical appointment.

19  (Doc. # 48-3 at 2.) Plaintiff was seen the following day, on March 31, 2011, for complaints of

20  numbness in his right thumb, burning in his right forearm, and pain in the back of his neck up to

21  his head. (Doc. # 48-4 at 3.)  He reported a six month history of numbness on the left side of his

22  back from the mid-back down. (Id.) It was noted that he had neck surgery in October 2007, and

23  back surgery in 1992. (Id.) He reported pain when pressure was put over the T3 and T12, and

24  decreased sensation on the left side of his back from the T10 down. (*Id*.) Plaintiff stated he was

25  concerned that he was developing the same thing that happened to his left harm. (*Id*.) Cervical

26  films were ordered, and he was referred back to the neurosurgeon. (*Id*.) In addition, Plaintiff was

27  _____

28         [4] Flexeril is a muscle relaxant.
       http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html, last visited January 13, 2015.

prescribed Tylenol. (Doc. # 48-1 at 4.)

On March 31, 2011, Dr. Gedney sent a request for a referral to the neurosurgeon, noting an appointment of May 18, 2011. (Doc. # 48-5 at 2.) This was approved on April 12, 2011. (*Id*.) In this request, Dr. Gedney noted that Plaintiff's previous surgery in 2007 resulted in some improvement, but in the past year Plaintiff had developed problems with his right arm similar to those he had experienced with respect to the left arm. (*Id*.)

On April 18, 2011, a request for an MRI of the neck and cervical spine was made, and approved on April 26, 2011. The MRI was performed on May 15, 2011. (Doc. # 48-1 at 4.) It was again ordered that Plaintiff be scheduled with the neurosurgeon. (*Id*.)

On April 21, 2011, Plaintiff sent a grievance stating that the URP was denying him medical care by denying him access to specialists, medications, and diagnostic tests. (Doc. # 47-1 at 2-6.) In response, Plaintiff was told his grievance was upheld inasmuch as he was scheduled for surgery. (*Id*. at 7.)

Plaintiff underwent a neurosurgical consultation with Dr. Vacca on May 18, 2011. (Doc. # 48-8 at 2-4.) Dr. Vacca noted that he had previously operated on Plaintiff in October 2007, when he performed   "left-sided 6-7, 7-1 and T1-T2 laminoforaminotomies for decompression of his left C7-C8 and T1 nerve roots." (Doc. # 48-8 at 2.) He noted that Plaintiff benefited from that procedure, had some chronic changes in his hand clawing and weakness in his first dorsal interossei, but did get some improvement of his symptoms. (*Id*.) Plaintiff reported that since that procedure he had started to experience symptoms in his right side, intermittent tingling and numbness in his fingers, and had chronic numbness in the left hand. (*Id*.) At the time of the consultation, Plaintiff was taking Flexeril. (*Id*.)

Dr. Vacca indicated that Plaintiff's MRI showed extensive degenerative changes in essentially every disc from C4 down to the upper thoracic spine. (*Id*. at 3.) He also had some canal stenosis with bilateral foraminal narrowing 4-5, 5-6, where he had not had surgery before. (*Id*.) In addition, he had narrowing on the right side, but not as bad on the left, where Dr. Vacca noted that the posterior laminoforaminotomy at 6-7 was adequate. (*Id*.)

On examination, Plaintiff's motor strength was 5/5 throughout, with the exception of

1    Plaintiff's left hand, where he was noted as having ulnar and C8-T1 weakness. (*Id.*) He was

2    assessed as having severe cervical spondylosis with bilateral radicular symptomatology. (*Id.*)

3    Dr. Vacca said he would recommend: "anterior cervical decompression and fusion, three levels

4    4-5, 5-6, 6-7, PEEK  cage, local bone graft and anterior plate." (*Id.*) Dr. Vacca noted that he

5    advised Plaintiff of the risks associated with the procedure, including a ten percent failure rate to

6    respond to surgery for which further surgery may or may not be indicated. (*Id.* at 3-4.)

7        Dr. Gedney sent a request for the surgery the very next day, on May 19, 2011. (Doc.

8    # 48-9 at 2.) It was approved on May 31, 2011. (*Id.*)

9        Physician's orders dated June 13, 2011, indicate that Plaintiff was prepped for surgery

10   scheduled for July 8, 2011. (Doc. # 48-1 at 4.) On June 20, 2011, Plaintiff had an EKG and labs

11   done. (Doc. # 48-4 at 4.)

12       Plaintiff underwent the surgery on July 8, 2011, and was discharged on July 11, 2011.

13   (Doc. # 48-10 at 2-4; Doc. # 71-1 at 6-7.) His prescription for Flexeril was changed to Robaxin,

14   and he was receiving Percocet. (Doc. # 48-10 at 3.) He was ordered to follow up with Dr. Vacca

15   in four weeks; he was to take over-the-counter Senokot; was prescribed as soft cervical collar to

16   wear as needed; it was recommended that he continue on the narcotic medication (one to two

17   every four hours for pain) and the Robaxin[5] (one every eight hours for spasms). (Doc. # 48-10 at

18   3; Doc. # 71-1 at 6.) Plaintiff was discharged back to the infirmary in stable condition. (Doc.

19   # 48-10 at 3.) It was noted that the radiculopathy had been resolved at the time of discharge. (*Id.*)

20       Physician's orders dated July 11, 2011, indicate that Plaintiff was to receive 5-10 mg of

21   oxycodone[6] every eight hours for two days. (Doc. # 48-1 at 5.) Additional cervical spine x-rays

22   were to be completed before his next visit with Dr. Vacca. (*Id.*) It was ordered that he be

23   scheduled with Dr. Vacca in four weeks. (*Id.*)

24       According to the medication records, Plaintiff was given oxycodone between July 11 and

25   July 13, 2011. (Doc. # 48-12 at 2.) He was also receiving Flexeril at that time. (*Id.*)

26   _____

27       [5] Another muscle relaxant.
     http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682579.html, last visited January 13, 2015.

28       [6] Oxycodone is a pain medication.
     http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html, last visited January 13, 2015.

1    Plaintiff returned to the clinic after being discharged following his surgery, and stated he

2    was doing "ok" and did not want to go to the infirmary. (Doc. # 48-4 at 4.) The notes reference

3    that Dr. Gedney ordered oxycodone for two days. (Id.) Plaintiff was instructed to come to the

4    clinic if he experienced increased pain, an opening in his wound, or if he had other concerns.

5    (*Id.*)

6    On July 14, 2011, Dr. Gedney submitted a request that Plaintiff be referred back to

7    Dr. Vacca in four weeks, and this was approved on July 19, 2011. (Doc. # 48-11 at 2.)

8    On July 14, 2011, another round of spinal films was ordered for three weeks out. (Doc.

9    # 48-1 at 5.) He was also ordered to be seen again by Dr. Gedney. (*Id.*)

10   Dr. Vacca saw Plaintiff for a post-operation follow up appointment on August 9, 2011.

11   (Doc. # 48-13 at 2.) Plaintiff reported improvement and was not having the radicular pain he had

12   previously. (*Id.*) It was also noted that Plaintiff was "not taking much in the way of pain

13   medication." (*Id.*) Plaintiff reported that x-rays were taken, and Dr. Vacca noted that he would

14   track them down to review, and would notify the patient. (*Id.*) Dr. Vacca stated: "[w]e will

15   usually check some films at three months postoperatively and then six months postop as well."

16   (*Id.*) Plaintiff was advised to follow up with Dr. Vacca as necessary. (*Id.*)

17   Plaintiff sent a kite to Dr. Gedney that same day and reported he had seen Dr. Vacca.

18   (Doc. # 48-15 at 2.) He asked to see Dr. Gedney to have his eyes and blood pressure checked, as

19   his vision seemed to be affected by the surgery. (*Id.*) He also requested a high fiber diet and

20   wanted to discuss his medications and Tylenol. (*Id.*) He further reported that his throat was still

21   sore. (*Id.*)

22   On August 15, 2011, it was noted that Plaintiff could be seen by the nurse on August 28,

23   2011, but Plaintiff stated he would wait for his appointments in a few weeks. (Doc. # 48-4 at 4.)

24   On August 18, 2011, X-rays of the cervical spine were scheduled for October 19, 2011

25   and January 18, 2012. (Doc. # 48-1 at 5.)

26   On August 25, 2011, Plaintiff was seen post-second cervical neck surgery. (Doc. # 48-4

27   at 4.) He reported that the surgery helped the issues he was having with his right arm and he had

28   regained strength. (*Id.*) He was still having some problems swallowing. (*Id.*)

- 13 -

On the same date, the Flexeril was discontinued at his request, and Plaintiff was prescribed Baclofen[7] instead, and was given Tylenol to keep on his person. (Doc. # 48-1 at 5; Doc. # 63 at 3.) His soft diet was continued. (*Id*.) He was ordered to be scheduled with the eye doctor regarding changes in his vision following surgery. (*Id*.)

On September 24, 2011, Plaintiff sent a kite to renew his Tylenol pack for pain, and asked to see Dr. Gedney regarding pain medications and noted he was having a problem swallowing. (Doc. # 71-1 at 2.)

On September 26, 2011, he was prescribed Baclofen. (Doc. # 48-1 at 6.)

On October 3, 2011, spinal x-rays were requested by Dr. Vacca. (Doc. # 65-2.) Two days later, on October 5, 2011, spinal x-rays were ordered to be taken in November and were to be sent to Dr. Vacca. (Doc. # 48-1 at 6.) The x-rays were taken on November 9, 2011. (*Id*.)

Plaintiff sent a kite to Dr. Gedney on October 17, 2011, asking for Lyrica[8] because Dr. Vacca and Dr. Dawson both said it may help without having side effects. (Doc. # 71-1 at 3.) The response stated: "sick call." (*Id*.)

Plaintiff sent a kite on December 21, 2011, to re-order medications for acid reflux and asked Dr. Gedney to order Tylenol and a pain medication replacement for Baclofen, as well as a request for Lyrica. (Doc. # 71-1 at 4.)

On December 23, 2011, Plaintiff was seen for a sick call and complained of pain and numbness in his arms, hands, and back of his neck. (Doc. # 48-4 at 5.) He was scheduled to be seen by Dr. Vacca on February 1, 2012. (*Id*.)

On December 25, 2011, Plaintiff was brought in for evaluation. (Doc. # 48-4 at 5.) A form titled "medical report of incident, injury or unusual occurrence" of that date characterizes the incident as "non-mandown." (Doc. # 65-10 at 2.) It indicates that Plaintiff complained of having a lump in his throat. (*Id*.) He relayed that he had back surgery in July, and had cold-like

---

[7] Another muscle relaxant. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html, last visited January 13, 2015.

[8]"[U]sed to relieve neuropathic pain (pain from damaged nerves)[.]" http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html, last visited January 13, 2015.

symptoms the previous week, and was very congested. (*Id*.) He was assessed as having cold-like symptoms that aggravated his condition post-surgery. (*Id*.) He was to be given some form of treatment, but the precise treatment ordered is not legible. (*Id*.)

While waiting for his appointment with Dr. Vacca, Plaintiff was ordered to undergo additional x-rays, which took place on January 18, 2012. (Doc. # 65-3.)

Plaintiff saw Dr. Vacca on February 6, 2012, and that day Dr. Vacca sent Dr. Gedney a letter stating that he reviewed Plaintiff's recent x-rays and they looked "very good." (Doc. # 48-14 at 2.) He asked that this be conveyed to Plaintiff. (*Id*.) He stated that he did not see a need to repeat any x-rays unless new symptoms were to develop. (*Id*.)

On April 9, 2012, Plaintiff was ordered to have a soft diet. (Doc. # 48-1 at 6.)

On May 25, 2012, Plaintiff was seen at sick call complaining of neck pain, vision problems and tingling and burning. (Doc. # 48-4 at 6.) It was noted that he would be referred to an outside provider for evaluation. (*Id*.)

On July 1, 2012, Plaintiff sent a kite complaining of pain in his arms, hands, neck, and mic-back, headaches, as well as vision problems since his July 2011 surgery, weakness in his hands and arms and swallowing problems. (Doc. # 71-1 at 5.) He stated that his eyes were very sensitive to light. (*Id*.)

Plaintiff was seen on July 10, 2012, with complaints of pain in his upper extremities. (Doc. # 48-4 at 6-7.) He reported numbness over the top of the right side of his back and shoulder that is exacerbated by head movement. (*Id*. at 6.) He also had pain in the palms of his hands, headaches, throat irritation. (Id.) He indicated he was taking "ASA/Tylenol/IBUs" for his chronic pain. (*Id*.) On examination, he had decreased range of motion in his neck. (*Id*. at 7.) His sensation and strength were noted as being intact and symmetrical, except he had decreased strength and atrophy over the left hands. (*Id*.)  He was ordered to be scheduled for the eye clinic. (Doc. # 48-1 at 7.) Soft tissue neck x-rays were also ordered. (*Id*.) Plaintiff was prescribed an ibuprofen pack on July 20, 2012. (*Id*.) He was seen regarding his blood pressure on July 25, 2012. (Doc. # 48-4 at 7.)

There do not appear to be any pertinent records between the end of July 2012, and the

- 15 -

1  next record which appears in December 2013. (Doc. # 48-1 at 7.)

2  On December 18, 2013, Plaintiff had additional cervical spine x-rays taken. (Doc. # 65-
3  5.) The results indicated no abnormal motion. (*Id*.)

4  In December 2013, Plaintiff was also seen by vision consultant, Dr. Sellestad. (Doc. # 65-
5  4.) Plaintiff was assessed as needing bifocals. (*Id*.)

6  Dr. Gedney referred Plaintiff to Dr. Vacca on April 10, 2014, regarding more problems
7  with his cervical neck fusion. (Doc. # 65-6.) The referral was authorized on April 15, 2014, and
8  an appointment was scheduled for May 7, 2014. (*Id*.)

9  Plaintiff was seen by Dr. Vacca for another neurosurgical consultation on May 7, 2014.
10  (Doc. # 48-17 at 2-3.) At that time, he complained of recurrent pain in his left arm, and tingling
11  and itchiness in the palms of his hands, pain in his low back with symptoms down his right leg.
12  (*Id*. at 2.) On examination, Plaintiff was noted as having ulnar weakness in his hand with wasting
13  of his first interossei and deformity in his finger consistent with old ulnar neuropathy. (*Id*.) He
14  had good strength in his legs and upper body, and no significant limitation in his neck. (*Id*. at 3.)
15  A recent x-ray of his neck showed good appearance of fusion. (*Id*.) The flexion/extension views
16  did not show any instability. (*Id*.) It was Dr. Vacca's impression that Plaintiff had recurrent left-
17  sided cervical radicular symptoms. (*Id*.) He recommended a cervical MRI to rule out accelerated
18  degenerative disc disease at the level above or below the fusion with some cord compression or
19  nerve root compression. (*Id*.) Since Plaintiff was also having lumbar symptoms, he also
20  recommended a lumbar MRI without contrast and plain films of the lumbar spine. (*Id*.)
21  Dr. Vacca indicated he would review the results and contact Dr. Gedney to discuss whether there
22  was any surgical option for Plaintiff if significant compressive pathology was identified. (*Id*.)

23  MRIs of the cervical and lumbar spine were ordered on May 20, 2014. (Doc. # 65-8.)

24  Dr. Vacca's notes dated August 21, 2014, indicate that when he saw Plaintiff on May 7,
25  2014, he complained of pain in his left arm, some numbness in both arms and in his palms, and
26  low back pain. (Doc. # 65-12 at 2.) Dr. Vacca reviewed the most recent MRI results, and
27  concluded the cervical MRI showed post-surgical changes, with some accelerated degenerative
28  changes at the level above and below his fusion at C3-4 and C7-T1. (*Id*.) The lumbar MRI

showed lateral recess stenosis at L4-5, and a bit of foraminal narrowing in the L5-S1 foramen for the exiting right L5-S1 root. (*Id*.) Plaintiff had no change in his gait or balance. (*Id*.) He was described as having an old ulnar neuropathy on the left hand with deformity, and had previous ulnar and carpal tunnel surgery on the left. (*Id*.) On examination, Plaintiff's gait was normal, his strength was 5/5 except for ulnar innervated muscles. (*Id*.) Dr. Vacca requested an EMG nerve conduction study of both arms, lumbar epidural steroid at L4-5, cervical epidural steroid at C7-T1. (*Id*.) Plaintiff was advised to follow up about a month after these procedures were performed. (*Id*.) Dr. Vacca noted that if the symptoms persisted, Plaintiff could potentially benefit from decompression at C7-T1 and/or at L4-5 with a possible decompression of the L5 root as well. (*Id*.) He stated: "The question is whether or not he might have some recurrent peripheral nerve compression as his numbness he describes in the palmar surface of the hands is somewhat suggestive of carpal tunnel syndrome." (*Id*.) He deferred to Dr. Gedney whether Plaintiff should receive pain medication, stating that Plaintiff "might be considered for gabapentin or judicious hydrocodone on occasion." (*Id*.)

It should be noted that Plaintiff submitted two undated kites complaining of neck pain, numbness, vision impairment, shakes and burning in his hands. (Doc. # 48-15 at 3-4.) The records provided also include an undated consultant's report noting complaints of vision changes since the surgery. (Doc. # 71-1 at 8.)

**3. Analysis of All Claims *Except* Plaintiff's Claim Against Peery Related to His Requests to See an Eye Doctor**

With the exception of Plaintiff's claim that defendant Peery ignored his requests for a visit with the eye doctor (which will be addressed, *infra*), the court finds that the undisputed facts establish that Defendants did not act with deliberate indifference toward Plaintiff's serious medical needs. Instead, Plaintiff was provided with responsive care in connection with his complaints, was seen by NDOC physicians and medical staff and was consistently referred to the consulting neurosurgeon.

First, Plaintiff claims that he began experiencing pain, numbness and a lack of mobility in his hands and arms, but Defendants ignored his requests. The medical evidence reveals that

1   Plaintiff complained again about numbness in his arms and pain in his back and neck in late

2   March 2011. (Doc. # 48-1 at 4; Doc. # 48-3 at 2; Doc. # 48-4 at 3.) In response to these

3   complaints, cervical films were ordered, Plaintiff was prescribed Tylenol, and a referral was

4   requested for Plaintiff to see a neurosurgeon. (*Id.*) The request for referral was approved shortly

5   thereafter, on April 12, 2011, and an appointment was scheduled for the following month. (Doc.

6   # 48-5 at 2.) The MRIs were ordered in April 2011, and took place in May 2011. (Docs. # 48-6 at

7   2; Doc. # 48-1 at 4.) Plaintiff saw the neurosurgeon, Dr. Vacca, on May 18, 2011. (Doc. # 48-8

8   at 2-4.) Dr. Vacca noted extensive changes since he had last performed surgery on Plaintiff in

9   2007, and recommended that Plaintiff undergo an additional procedure. (*Id.*) He did advise that

10  there was a ten percent failure rate to respond to surgery for which further surgery may or may

11  not be indicated. (*Id.*)

12        Dr. Gedney sent a request for the surgery the following day, and it was approved twelve

13  days later, on May 31, 2011. (Doc. # 48-9 at 2.) Plaintiff underwent the necessary preparations

14  for surgery, and the surgery took place on July 8, 2011. (Doc. # 48-10 at 2-4; Doc. # 71-1 at 6.)

15        Thus, Plaintiff's claims that his complaints were ignored and that the surgery was delayed

16  by the URP members are directly contradicted by the medical evidence.

17        Next, Plaintiff claims that following the July 2011 surgery, Defendants knowingly

18  deprived him of pain medication in contravention of his physicians' orders, and denied his

19  requests for physical therapy. These claims are similarly belied by the records. Plaintiff is correct

20  that Dr. Vacca's discharge instructions do state that Plaintiff should continue on narcotic

21  medication, but the discharge instructions do not contain a time parameter, as Plaintiff suggests,

22  let alone an order that Plaintiff should have continued on narcotic pain medication for six to eight

23  weeks following the procedure. (Doc. # 48-10; Doc. # 71-1 at 6.) Plaintiff did receive narcotic

24  pain medication through July 13 (Doc. # 48-12 at 2), and when he returned to the prison, he

25  indicated he was doing "ok" and that he did not want to stay in the infirmary (Doc. # 48-4 at 4.)

26  He was advised to return to the clinic if his pain worsened, but there is no indication he did so, to

27  request additional narcotic pain medication, or otherwise.

28        With respect to his claim that Defendants wrongfully denied his requests for physical

- 18 -

therapy, there is no indication in the records that physical therapy was medically indicated. It was not in the discharge notes or other treatment notes from Dr. Vacca, the outside specialist overseeing Plaintiff's care for these issues. (*See also* Doc. # 59-3 at 13, Dr. Bannister's response to Pl.'s interrogatory No. 13, indicating that a decision to have physical therapy would have been made by the surgeon.)

Plaintiff then contends that he began to experience extreme pain and a lack of mobility a year after his surgery, and his complaints were ignored. The evidence before the court with respect to this claim simply does not support Plaintiff's contention.

Additional films were taken after Plaintiff's surgery and he was seen by Dr. Vacca on August 9, 2011. (Doc. # 48-13 at 2.) He reported improvement. (*Id.*) He was advised to follow up with Dr. Vacca as necessary. (Id.) Plaintiff sent a kite to Dr. Gedney that same day asking to be seen. (Doc. # 48-15 at 2.) Plaintiff was seen again on August 25, 2011, and reported that the surgery had helped the issues he was having with his right arm. (Doc. # 48-4 at 4.) He was prescribed Baclofen and Tylenol. (Doc. # 48-1 at 5.) He was ordered to be scheduled with the eye doctor. (*Id.*)

On September 24, 2011, he asked to see Dr. Gedney regarding his medication. (Doc. # 71-1 at 2.) He was prescribed Baclofen two days later. (Doc. # 48-1 at 6.) X-rays were ordered in October 2011, and taken in November 2011, per Dr. Vacca's request. (Doc. # 48-1 at 6.) Plaintiff sent a kite to Dr. Gedney on October 17, 2011, asking for Lyrica, and in response was told to go to sick call. (Doc. # 71-1 at 4.) He sent another kite on December 21, 2011, regarding a pain medication replacement for Baclofen. (Doc. # 71-1 at 4.) On December 23, 2011, he was seen and complained of pain and numbness, and was scheduled to see Dr. Vacca in early February 2012. (Doc. # 48-4 at 5.) He was seen and evaluated concerning a complaint of a lump in his throat on December 25, 2011. (Doc. # 65-10 at 2.) Additional x-rays were obtained in January 2012. (Doc. # 65-3.)

Plaintiff saw Dr. Vacca in February 2012, and Dr. Vacca stated that Plaintiff's x-rays looked "very good." (Doc. # 48-14 at 2.) Dr. Gedney also saw Plaintiff on February 9, 2012, and assessed his complaints of coughing and throat tightening and determined it could be due to his

1    prior surgeries. (Doc. # 48-4 at 6.)

2       Plaintiff next complained of neck pain, vision problems and tingling in May 2012. (Doc.

3    # 48-4 at 6.) It was noted that he would be referred to an outside provider for evaluation. (*Id.*)

4       Plaintiff next sent a kite on July 1, 2012 with complaints of pain, vision problems,

5    weakness in his arms and hands, and swallowing problems. (Doc. # 71-1 at 5.) He was seen on

6    July 10, 2012. (Doc. # 48-4 at 6-7.) It was noted that he had been placed on a soft diet to help

7    with his throat. (*Id.*) He was taking Tylenol and ibuprofen for his pain. (*Id.*) It was ordered that

8    he be scheduled with the eye clinic, and that soft tissue neck x-rays be obtained. (Doc. # 48-1 at

9    7.) He was prescribed an ibuprofen pack on July 20, 2012. (*Id.*)

10       The record does not contain any relevant medical records between the end of July 2012

11    and December 2013. Notably, there are no kites or grievances during this time period indicating

12    Plaintiff continued to complain of pain, numbness, or any other issue, that would have put

13    Defendants on notice as to any medical issues that Plaintiff felt were not receiving appropriate

14    attention. The next record before the court indicates that Dr. Gedney referred Plaintiff back to

15    Dr. Vacca on April 10, 2014, and then Plaintiff saw Dr. Vacca on May 7, 2014. (Doc. # 65-6.)

16       In sum, the evidence contradicts Plaintiff's claim that his complaints regarding his

17    condition following his July 2011 surgery were ignored.

18       Nor does the record contain evidence to support Plaintiff's assertion that Defendants

19    refused to approve an additional medical procedure requested by Dr. Vacca. When Plaintiff saw

20    Dr. Vacca on May 7, 2014, he ordered various tests to determine how to proceed. (Doc. # 48-17

21    at 2-3.) Dr. Vacca reviewed the MRI results, and concluded that they showed post-surgical

22    changes. (Doc. # 65-12 at 2.) Dr. Vacca recommended that Plaintiff receive various steroid

23    injections to address these new issues, and stated that *if*, in spite of the steroid treatment, the

24    condition persisted, Plaintiff "*could potentially benefit*" from additional procedures. (*Id.*)

25    Dr. Vacca stated that Plaintiff "might" be considered for pain medication, but deferred that

26    course of action to Dr. Gedney. (*Id.*)  Plaintiff does not argue that he did not receive the

27    recommended injections. Nor did Dr. Vacca unequivocally recommend that another procedure

28    take place, as Plaintiff suggests.

The record does not support Plaintiff's contention that Dr. Bannister encouraged staff to deprive inmates of care due to cost or an inmate's conviction. The discovery responses provided by Plaintiff in support of his cross-motion and opposition actually demonstrate the lack of merit to this claim. Dr. Bannister, Dr. Mar and Dr. Johns each responded that neither the type of conviction nor length of sentence has any impact on whether or not a medical procedure is approved or denied. (*See* Doc. # 59-3 at 9-10, 22, 31.) They also responded that budgetary constraints did not impact the care Plaintiff received. (*See* Doc. # 59-3 at 17, 21, 30.) Plaintiff likewise presents no support for his claim that Dr. Bannister failed to supervise or train his employees.

The record is similarly devoid of evidence that Dr. Bannister, Dr. Mar and Dr. Johns, as members of the URP, purposefully deprived Plaintiff of surgeries due to cost. Instead the evidence demonstrates that each time a surgery was recommended by a specialist, it was requested by Dr. Gedney (Plaintiff's treating physician), and approved by the URP. (*See* Dr. Johns Decl. at Doc. # 47-4 ¶¶ 7-9, indicating that she reviewed Plaintiff's medical file which would contain all consultation request/report forms submitted on his behalf, and each of the sixteen forms submitted between September 2005 and July 2001 were approved by the URP.)

Finally, the court finds there is no evidence to support Plaintiff's claim that Nurse Peery had a policy of rarely scheduling sick call appointments or setting them out too far.

In sum, the court recommends that Defendants' motion for summary judgment be granted as to these claims, and that Plaintiff's cross-motion be denied.

**4. Vision Claim**

The court does find, however, that a genuine dispute of material fact exists as to whether defendant Peery was deliberately indifferent when Plaintiff's requests for a visit with the eye doctor were allegedly ignored.

On August 9, 2011, Plaintiff sent a kite to Dr. Gedney asking to have, *inter alia*, his eyes checked. (Doc. # 48-15 at 2.) He stated that his vision seemed to have been affected by his recent surgery. (*Id*.) Plaintiff was seen on August 25, 2011. (Doc. # 48-4 at 4.) It was ordered that he be scheduled with the eye doctor regarding changes in his vision following the surgery. (Doc.

1    # 48-1 at 5.) On March 18, 2012, Plaintiff sent a kite asking to be seen by the eye doctor. (Doc.

2    # 65-9.) In response he was told: "You will be scheduled as soon as we get an eye doctor." (*Id.*)

3            Plaintiff next complained about his vision on May 25, 2012, when he was seen at sick

4    call. (Doc. # 48-4 at 6.) He sent a kite that included a complaint of vision problems again on July

5    1, 2012. (Doc. # 71-1 at 5.) On July 10, 2012, it was again ordered that he be scheduled for the

6    eye clinic. (Doc. # 48-1 at 7.) Plaintiff was seen by vision consultant, Dr. Sellestad in December

7    2013, and was assessed as needing bifocals. (Doc. # 65-4.)

8            In support of their motion, Defendants provide the declaration of  John Peery, who was

9    employed as Director of Nursing Services II at NNCC during the relevant time period. (Doc.

10   # 52-1 ¶ 2.) According to Peery, there was a point in time when NNCC did not have an on-site

11   eye doctor, and inmate patients who kited to see an eye doctor were told they would be referred

12   to one as soon as NNCC employed one; as such, if Plaintiff was denied an eye doctor

13   appointment, it was due to lack of availability of an eye doctor and not due to indifference to his

14   vision problems. (*Id.* ¶ 9.)

15           In their response to Plaintiff's cross-motion and opposition to their motion, Defendants

16   also provide the declaration of Ashley Randolph, a Radiologic Technician 2 at NNCC, who is in

17   charge of coordinating inmate x-rays and coordinating the inmate eye clinic. (Doc. # 63-15 ¶¶ 1-

18   2.) According to Ms. Randolph, NNCC does not have its own on-site eye doctor that is an

19   employee of NDOC, but an outside private contractor provides vision services to NNCC.

20    (Doc. # 63-15 ¶ 4.) Eye doctors make their own schedules and decide when they want to work

21   with inmates and for how long. Typically, the eye doctor works one day a week for half of the

22   day at the prison. (*Id.* ¶ 5.) Between 10-15 inmates are seen per week given this schedule. (*Id.*

23   ¶ 6.)

24           She asserts that the eye doctor who would have seen Plaintiff ceased working with

25   NDOC in January 2012, leaving NDOC without an eye doctor. (Doc. # 63-15 ¶ 7.) When the eye

26   doctor ceased services, 500 inmates were on the waiting list for an eye appointment. (*Id.* ¶ 8.)

27   When Randolph took over as the coordinator for the eye clinic in May 2012, there were still 500

28   inmates on the waiting list. (*Id.* ¶ 9.) This eye doctor quit before Plaintiff could be seen, and by

the time Plaintiff sent a reminder kite that he needed to be seen by an eye doctor in March 2012, there was no eye doctor. (Doc. # 63 at 7; Doc. # 65-9 (Pl.'s Mar. 18, 2012 kite asking for an eye doctor appointment).)

The new eye doctor, Dr. Sellestad, started in June 2012, and he works a half day per week at the prison and sees about 15 inmates per week. (Doc. # 63-15 ¶ 10.) When he started there was about a seven month backlog on eye appointments. (*Id.* ¶ 11.) Ms. Randolph asserts that she prioritized the eye appointments based on an emergent basis as determined by a doctor, and second, based on persons whose kites were oldest. (*Id.* ¶ 12.) No doctor notified her that Plaintiff's appointment was an emergent need. (*Id.* ¶ 13.) So Plaintiff's appointment occurred in the order in which he had submitted his kite. (*Id.* ¶ 14.) Plaintiff saw Dr. Sellestad in August 2012, and got his glasses in September 2012. (*Id.* ¶ 15.) Eyeglass prescriptions are filled offsite and it takes on average a few weeks to receive them. (*Id.* ¶ 16.) Since she took over as coordinator for the eye clinic, Plaintiff has received three pairs of eye glasses. (*Id.* ¶ 17.) As such, she asserts that any delay in Plaintiff receiving new glasses was not due to deliberate indifference, but the lack of an eye doctor at NNCC. (Doc. # 63 at 7.)

The court appreciates the predicament NNCC was placed in when its contracted eye doctor ceased working for it in January 2012, but Plaintiff made his initial complaint about his vision in August 2011, and Dr. Gedney ordered that he be scheduled to see the eye doctor initially on August 25, 2011. The previous eye doctor did not cease working with NNCC until January 2012, and Plaintiff was not seen from the time he initiated his complaint in August 2011 through the time the eye doctor left in January 2012. Plaintiff eventually filed another kite requesting to see an eye doctor in March 2012, some seven months after his initial complaint. He was still not seen, and complained of his vision problems again in May 2012, some nine months after his initial complaint. At this time, NNCC still did not have an eye doctor. The new eye doctor started in June 2012, but Plaintiff was still not seen until December 2013. This is over two years from the time Plaintiff initially complained of vision problems, and eighteen months from the time the new eye doctor started.

Plaintiff is not entitled to summary judgment on this claim because he has not presented

1    evidence regarding the injury that was caused by the delay in seeing the eye doctor. Notably,

2    defendant Peery does not argue that Plaintiff cannot maintain this claim because he did not suffer

3    injury as a result of the delay.

4        Conversely, defendant Peery is not entitled to summary judgment because the evidence

5    presented by the parties reveals a significant delay from the time Plaintiff initiated his complaint

6    until he actually saw the eye doctor. This creates a genuine dispute of material fact as to whether

7    or not defendant Peery was deliberately indifferent to Plaintiff's serious medical need.

8        Accordingly, the court recommends that both defendant Peery's motion for summary

9    judgment and Plaintiff's cross-motion for summary judgment on this claim be denied.

10   **IV. RECOMMENDATION**

11       **IT IS HEREBY RECOMMENDED** that the District Judge enter an order **DENYING**

12   Plaintiff's Cross-Motion for Summary Judgment (Doc. # 60);

13       **IT IS HEREBY FURTHER RECOMMENDED** that the District Judge enter an order

14   **GRANTING IN PART AND DENYING IN PART** Defendants' Motion for Summary

15   Judgment (Doc. # 47) as follows: the motion should be granted except as to Plaintiff's Eighth

16   Amendment claim for deliberate indifference against defendant Peery related to the allegation

17   that defendant Peery ignored Plaintiff's requests to see an eye doctor.

18       The parties should be aware of the following:

19       1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

20   this Report and Recommendation within fourteen days of receipt. These objections should be

21   titled "Objections to Magistrate Judge's Report and Recommendation" and should be

22   accompanied by points and authorities for consideration by the district judge.

23       2. That this Report and Recommendation is not an appealable order and that any notice of

24   appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

25   until entry of judgment by the district court.

26   DATED: January 14, 2015

27                                    WILLIAM G. COBB
                                     UNITED STATES MAGISTRATE JUDGE

28

- 24 -